**COURT OF APPEALS
DECISION
DATED AND FILED**

**September 12, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP851-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF3329

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

TERRY A.D. STRICKLAND,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JEFFREY A. CONEN and GLENN H. YAMAHIRO, Judges. *Affirmed*.

Before White, C.J., Donald, P.J., and Dugan J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Terry A.D. Strickland appeals from a judgment of conviction for two counts of first-degree reckless homicide, with use of a dangerous weapon following a jury trial. He also appeals from the decision and order denying his motion for postconviction relief. On appeal, Strickland asserts that trial counsel was ineffective for failing to impeach a witness with a prior statement that she saw someone other than Strickland firing shots and for failing to call another witness who told police that he saw someone pointing a firearm at Strickland and attempting to pull the trigger, but the firearm jammed. He argues that both of these witnesses would have supported his claim that he acted in self-defense, and thus, "the result of the trial would have been different as [Strickland] would have been acquitted as he acted in self-defense." He argues that trial counsel performed deficiently and he was prejudiced by that conduct. Based on the record, we conclude that Strickland has not shown that trial counsel was ineffective, and we affirm.

## BACKGROUND

¶2 On July 17, 2016, at approximately 12:20 p.m., City of Milwaukee Police officers responded within minutes to several 911 calls regarding a shooting at 3536 North 26th Street in the City of Milwaukee. At the scene, police discovered two victims—Maurice Brown and Michael Reed. Brown's body was lying on his back face up in the gateway separating the sidewalk from the front yard of the residence. The officers observed that Brown had suffered multiple gunshot wounds. He was pronounced dead at the scene. Reed's body was outside the fence, lying face down on top of the curb parallel to the street. The officers observed that Reed had suffered a gunshot wound to the head. He was pronounced dead while being conveyed to the hospital.

2

¶3	During their investigation, officers recovered six spent .40 caliber bullet casings at the scene. Five were from one firearm and the sixth was from a different firearm.

¶4	Officers interviewed two eyewitnesses—Sonya Trotter and Erica Brown (Erica).[1] Trotter told police that she was inside a residence just down the street at 3522 North 26th Street. She heard multiple gunshots and she went onto the front porch to see what had happened. She observed a male armed with a pistol standing over a second male who was lying on the ground on the sidewalk in front of the residence above. Trotter said that she saw the armed man shoot the male on the ground. She said that the gunman turned as if to go into the residence at the subject location, but then got into the rear passenger side of a black SUV, which was parked on the street in front of the subject location. Trotter stated that the SUV then drove off northbound on 26th Street.

¶5	Erica told police that on the date of the shooting she went to the residence located at 3522 North 26th Street to drop her daughter off with the child's father. As she stood on the front porch with her daughter, she saw seven to eight male subjects loudly arguing in the yard in front of the subject residence. She stated that one of the shooting victims (subsequently identified as Brown) was trying to stop the argument and somehow ended up on the ground. Erica then stated that she saw a male subject shoot the man on the ground four times at close range, while the man laid on the ground. She went inside to get her daughter out of harm's way. While inside, she heard another gunshot coming from the same location as where she saw the first four shots. She then stepped back out onto the

_____

[1] Erica Brown and Maurice Brown are not related.

front porch and observed a black SUV parked in front of the subject residence drive off northbound on 26th Street. Both Trotter and Erica identified Strickland, in a photo array, as the person who shot Brown.[2]

¶6 Through their investigation, police were able to locate Strickland in El Paso, Texas, where he was living under a fictitious name. The State charged Strickland with two counts of first-degree intentional homicide, with use of a dangerous weapon for the shooting deaths of Brown and Reed. The matter proceeded to a jury trial on May 30, 2017. During the trial, the jury heard testimony from several law enforcement officers and citizen witnesses. Trotter testified consistent with her statements to the police and her identification of Strickland as the shooter in the photo array and in court.

¶7 Erica testified consistent with her statements to the police. She stated that there were seven to eight people in the altercation that began as a verbal argument, progressed to a physical fight, and then to the shooting. She saw Strickland standing on a step, shooting. She testified that she only saw Strickland with a gun—she did not see anyone else with a gun. She then ran into a house and when she came back out, she saw a second male on the ground. Erica also testified that she identified Strickland as the shooter from the photo array and identified him in court, as well.

---

[2] Strickland was identified as a suspect because he lived in the residence where the shootings occurred. Officers received and executed a search warrant at the subject property and discovered three cell phones, a magazine for a semi-automatic pistol loaded with eight unspent .40 caliber casings, an Illinois identification card containing Strickland's information, and a Milwaukee County Jail inmate property receipt with Strickland's information.

¶8     The jury also heard testimony from an assistant Milwaukee County medical examiner who testified that both Brown and Reed died from gunshot wounds.  A detective who was at the scene of the shooting testified regarding the evidence that was collected.  There were five casings found in an area close around the stairs of the house.  Based on where the casings were found, police determined that the shooter was facing toward the street when discharging the firearm.  The five casings were from a .40 caliber firearm.  The sixth casing was farther away on the pavement.  The five casings were fired from one firearm, and the sixth was fired from another.

¶9     The jury also heard testimony from Lisa De La Paz who was the woman that Strickland and his girlfriend were living with in El Paso after he left Milwaukee.[3]  She testified that Strickland told her his name was "Chi."  She stated that he and his girlfriend came to live in her house with her and her son in November 2016 and stayed there for a few months.  In January 2017, the El Paso police came to her home looking for Strickland.  She told them that she did not know who that was.  The police wanted to search her house and she said no and they left.  Strickland's girlfriend then called a friend for a ride to get away from the house.  De La Paz testified that as Chi was leaving, he told her that "I'm Terry A.D. Strickland.  I'm the one they're looking for.  I'm the one that killed those two men.  I did it to protect my cousin."  When Strickland left, she looked him up on her son's cell phone and discovered that Strickland was on the FBI's most wanted

_____

[3] De La Paz testified that she did not know Strickland prior to meeting him in El Paso and only offered to share her home with him and his girlfriend because they were homeless and she wanted to help them.

list. Three to four days later, she called the FBI hotline and turned Strickland in. She identified Strickland in court as Chi.

¶10 Strickland also testified. He stated that he lived at the subject property for about a year or a year and one-half prior to the shooting. He described it as a rooming house with two bedrooms upstairs where a man and a woman lived in each bedroom—he lived in a bedroom on the first floor with his eighteen-month-old child.

¶11 Strickland testified that on the day of the shooting he was on his front porch and his neighbors who he called "Somalians," were drinking and being loud and "rambunctious." There were six or seven of them. Strickland walked off his porch and went over to them and asked them to quiet down because his child was sleeping. The group initially agreed but became louder again minutes later. The group then came back to his house and tried to get in the front door. He testified that Brown and Reed were in the group.

¶12 Strickland testified that at this point there were ten to fifteen men in his yard. A verbal argument ensued and developed into a physical fight when Brown struck him. He also testified that he saw a couple of individuals with firearms in the yard. He then stated that he was "dazed" by a blow from Brown and then heard a gunshot. He testified that he saw Brown going for a gun on the ground and Strickland went for the gun and got it first. Strickland stated that he then saw Ronnie Burrows[4] point a firearm at him and squeeze the trigger, but the

---

[4] Burrows is spelled "Burrows" and "Burroughs" throughout different portions of the record. To be consistent with the postconviction court's decision and the parties' spelling in their briefs, we also use "Burrows."

firearm jammed. Strickland then pointed the gun that he picked up off the ground at Burrows and squeezed the trigger. He did not know how many times he shot—he just squeezed the trigger because he was scared. He testified that a whole bunch of people started "popping up" and so he ran and jumped in a car. He also stated that he went in the house but by doing that he was jeopardizing his child's life and it was a possibility that the people were going to shoot up his house. He said that if he left, he thought they would follow him as the "target."

¶13 Strickland testified that he stayed in Milwaukee for a few days and then heard that someone had shot up his house—he got scared and left Milwaukee.[5] He also heard that there was a price on his head. He testified that he had no other option but to act in self-defense.

¶14 On cross-examination, Strickland testified that he was not saying in court that he saw anyone with a gun except for Burrows. When asked if he shot Reed, he stated that he did not know—"I was just scared for my life. I was just shooting the gun." He stated that he saw Burrows with a gun and that Burrows pointed it at him, squeezed the trigger, and the gun jammed. The prosecutor asked him, "after you empty your clip, nobody shoots at you, correct?" Strickland answered, "[c]orrect." He then stated that is when he ran away dropping the gun in his yard as he ran.

---

[5] Strickland testified that he went to El Paso and lived with De La Paz for a period of time until the police came to her house. He denied telling her that his name was Strickland and that he committed the crimes he was charged with.

¶15    At the close of the trial, the circuit court[6] instructed the jury on first-degree intentional homicide, with use of a dangerous weapon, self-defense, and the lesser included offenses of second-degree intentional homicide, with use of a dangerous weapon, and first-degree reckless homicide, with use of a dangerous weapon. After deliberations, the jury found Strickland guilty of both counts of the lesser included offenses of first-degree reckless homicide, with use of a dangerous weapon. The circuit court sentenced him to thirty-eight years in prison on each count, consecutive to each other, with thirty years initial confinement and eight years extended supervision on each count.[7]

¶16    Strickland filed a postconviction motion alleging two instances of ineffective assistance of counsel. He alleged that trial counsel was ineffective when he did not confront Erica with her statement to police that she saw one of the "Somali brothers," who was involved in the altercation run out of his house with a gun after Strickland shot Brown. He also alleged that trial counsel was ineffective for not calling Hassan Yusuf as a witness. Strickland alleges that Yusuf saw Burrows point a gun at Strickland and pull the trigger, but the gun jammed. Strickland argued that Erica's report of a man with another gun and Yusuf's statement about Burrows would have supported his self-defense argument and would have led to him being acquitted.

---

[6] The Honorable Jeffrey A. Conen presided over Strickland's jury trial and sentencing and the Honorable Glenn H. Yamahiro presided over Strickland's postconvicition motion. We refer to Judge Conen as the circuit court and Judge Yamahiro as the postconviction court.

[7] After sentencing Strickland, by counsel, filed a no-merit report. By order dated August 18, 2021, this court directed appellate counsel for Strickland to file a supplemental no-merit report in this matter. Counsel then advised this court that the case presented at least one arguably meritorious issue and requested voluntary dismissal of the no-merit appeal and an extension of appellate deadlines. This court granted the relief requested.

¶17 The postconviction court denied Strickland's motion without a hearing. It stated that Erica's statement was that "she saw the Somali brother exit with a handgun and start firing *after* the victims were struck. Under this circumstance, there is no reasonable probability that impeaching the witness with her prior statement would have assisted [Strickland's] self-defense claim." The court also stated that Yusuf's testimony would have been cumulative to Strickland's testimony and that "[t]here is no reasonable probability that the cumulative testimony of another witness would have resulted in an acquittal, particularly since [Strickland's] self-defense claim did not relate to Burrows but rather [to Brown and Reed]." It further stated that "[t]he court fails to perceive how evidence that Burrows attempted to shoot [Strickland] would have made it any more likely that the jury would have believed that he acted in self-defense when he shot and killed [Brown and Reed]."

¶18 The circuit further stated that "assuming that counsel was deficient in regard to the testimony of [Erica] and for failing to call [Yusuf], there was very strong evidence presented at trial that [Strickland] did *not* act in self-defense[.]" It described that evidence and then stated that "[w]hile [Strickland] raise[d] speculation about 'other shooters,' there is no reasonable probability that the jury would have ignored the forensic and ballistic evidence or his own acts and admissions, and therefore, the court finds that he was not prejudiced by counsel's performance in this case."

¶19 This appeal follows.

**DISCUSSION**

¶20 As noted above, Strickland asserts that trial counsel was ineffective for failing to impeach Erica with her prior statement that she saw one of the

"Somali brothers" firing shots and for failing to call Yusuf who told police that he saw someone pointing a firearm at Strickland and attempting to pull the trigger, but the firearm jammed. He argues that Erica's report of a man shooting another gun and Yusuf's statement about Burrows would have supported his self-defense argument and would have led to him being acquitted. He argues that trial counsel was deficient and he was prejudiced by that deficiency.

## I.    Standard of Review

¶21    "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel." *State v. Balliette*, 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334. A defendant must show two elements to establish that his or her counsel's assistance was constitutionally ineffective: (1) counsel's performance was deficient; and (2) the deficient performance resulted in prejudice to the defense. *Id.* "If the defendant fails to prove either prong, we need not address whether the other prong was satisfied." *State v. Floyd*, 2016 WI App 64, ¶22, 371 Wis. 2d 404, 885 N.W.2d 156.

¶22    "To demonstrate deficient performance, the defendant must show that his counsel's representation 'fell below an objective standard of reasonableness' considering all the circumstances." *State v. Carter*, 2010 WI 40, ¶22, 324 Wis. 2d 640, 782 N.W.2d 695 (citation omitted). "In general, there is a strong presumption that trial counsel's conduct 'falls within the wide range of reasonable professional assistance.'" *State v. Breitzman*, 2017 WI 100, ¶38, 378 Wis. 2d 431, 904 N.W.2d 93 (citation omitted).

¶23    Prejudice occurs when counsel's error is of such magnitude that there is a "reasonable probability" that but for the error, the outcome would have

been different. *State v. Erickson*, 227 Wis. 2d 758, 769, 596 N.W.2d 749 (1999). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citations omitted).

¶24 "An ineffective assistance of counsel claim presents a mixed question of fact and law." *State v. Pico*, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95. "We will not reverse the circuit court's findings of fact unless they are clearly erroneous." *Id.* "We independently review, as a matter of law, whether those facts demonstrate ineffective assistance of counsel." *Id.*

## II. Trial Counsel was not Ineffective

¶25 Strickland states that his defense was that he acted in self-defense. He asserts that he was "dazed" by a blow he received while fighting with Brown and then heard a gunshot. Strickland states that he saw Brown going for a gun on the ground and Strickland went for the gun and got it first. Further, he states that he saw Burrows point a firearm at him and squeeze the trigger, but the firearm jammed. He says that he then pointed the gun that he picked up off the ground at Burrows and squeezed the trigger. He did not know how many times he shot—he just squeezed the trigger because he was scared. Thus, he argues that his actions were done in self-defense.

¶26 The problem with Strickland's argument is that, at best, he is asserting that he was acting in self-defense when shooting at Burrows who was trying to shoot him. First, he does not say that Brown was in any way threatening him. Although Strickland says that Brown was reaching for a gun on the ground, he also says that he got to the gun before Brown, picked it up, and that was the gun

11

that he pointed at Burrows and shot at him. Thus, the evidence shows that Brown did not possess a gun and was not threatening Strickland at the time Strickland began shooting. Second, as to Reed, Strickland does not even make any claim that Reed was threatening him, let alone that Reed ever possessed a gun. He merely says that Reed was there at the time of the shooting.

¶27 We conclude that even if Strickland could claim he acted in self-defense based on his assertion that Burrows had a gun, pointed it at Strickland, and tried to shoot him, he could not claim that he acted in self-defense as to Brown or Reed. Strickland fails to demonstrate that he could rely on self-defense based on the facts in this case. Pursuant to WIS. STAT. § 939.48(3)[8]:

> [t]he privilege of self-defense extends not only to the intentional infliction of harm upon a real or apparent wrongdoer, but also to the unintended infliction of harm upon a 3rd person, *except that if the unintended infliction of harm amounts to the crime of first-degree ... reckless homicide, ... the actor is liable for whichever one of those crimes is committed.*

(Emphasis added.)[9] Thus, a person's privilege to act in self-defense against a wrongdoer—allegedly Burrows in this case—does not extend to unintended first-degree reckless homicide of a third person.

¶28 As noted, here Strickland was charged with two counts of first-degree intentional homicide and convicted of the lesser included offenses of first-degree reckless homicide. He acknowledges that he fired the gun to protect himself from Burrows—not from either Brown or Reed. Therefore, the plain

---

[8] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[9] We note that the statute specifies other crimes that are not relevant to this case.

12

language of WIS. STAT. § 939.48(3) bars Strickland from asserting self-defense to avoid conviction of the two counts of first-degree reckless homicide of Brown and Reed.[10]

¶29    We conclude that because Strickland offers no legal authority demonstrating the viability of his self-defense claim that he advances, considering the facts of this case, including the fact that he was convicted of two counts of first-degree reckless homicide, he fails to show that trial counsel performed deficiently by not introducing the testimony of Erica and Yusuf that he argues would support his self-defense claim.

¶30    Moreover, we note that in its response brief the State made the argument that WIS. STAT. § 939.48(3) applied to the facts in this case, and therefore, Strickland's privilege of self-defense did not apply to first-degree reckless homicide.  It argued that accordingly, not only would there not have been a reasonable probability of a different result, but rather, a different result was not possible under the statute based on the facts in this case.  Strickland does not respond to the State's argument in his reply brief, and thus, we consider that he concedes that the State is correct.  *See **United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (holding that an appellant's failure to dispute respondent's arguments in a reply brief may be taken as a concession).

---

[10] We note that although the postconviction court did not rely on this statute in rendering its decision, "it is well-established law in Wisconsin that an appellate court may sustain a lower court's ruling 'on a theory or on reasoning not presented to the lower court.'" ***Blum v. 1st Auto & Cas. Ins. Co.***, 2010 WI 78, ¶27 n.4, 326 Wis. 2d 729, 786 N.W.2d 78 (citation omitted).

**CONCLUSION**

¶31     For the reasons stated above, we conclude that Strickland failed to show that trial counsel was deficient in his performance.  Further, we conclude that by failing to refute the State's argument that WIS. STAT. § 939.48(3) applied to the facts in this case, and therefore, Strickland's privilege of self-defense did not apply to first-degree reckless homicide, that he conceded the argument.  We, therefore, affirm the judgment and order of the circuit court and postconviction court.

    *By the Court.*—Judgment and order affirmed.

    This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.